**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JACK W. SCOTT,** | ) | **CASE NO. 3:08CV1837** |
| | ) | |
| **Petitioner,** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **ED SHELDON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | **REPORT AND RECOMMENDATION** |

Petitioner, Jack W. Scott ("Scott"), *pro se*, challenges the constitutionality of his

conviction in the case of *State v. Scott*, Hardin County Court of Common Pleas Case No. 2005-

2103CRI.  Scott filed his Petition for Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C.

§ 2254 on July 30, 2008.  On December 9, 2008, Warden Ed Sheldon ("Respondent") filed his

Answer/Return of Writ.  (Doc. No. 10.)  In response, Scott filed a motion for stay and abeyance

on January 29, 2008.  (Doc. No. 13.)  The Court denied Scott's motion for stay without

prejudice, allowing him to respond by either filing a motion to amend his Petition or, in the

alternative, to provide the details of the newly discovered evidence he claimed to possess in

support of his original Petition.  (Doc. No. 15.)  On April 27, 2009, Scott filed a motion to amend

the Petition.  (Doc. No. 16.)  The Warden filed an opposition brief.  (Doc. No. 17.)  Scott did not

file a reply.  This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2.

For reasons set forth in detail below, it is recommended that Scott's Petition and his motion to

amend be denied.

## I.  Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts "shall be presumed to be correct."

28 U.S.C. § 2254(e)(1); *see also House v. Bell*, 283 F.3d 37 (6th Cir. 2002).  The state appellate court summarized the facts underlying Scott's conviction as follows:

{¶ 2} On September 19, 2005, the Hardin County Grand Jury indicted Jack on six counts [FN1] of endangering children, violations of R.C. 2919.22(A), (E)(2)(b), felonies of the fourth degree; seven counts [FN2] of endangering children, violations of R.C. 2919.22(A), (E)(2)(c), felonies of the third degree; two counts [FN3] of endangering children, violations of R.C. 2919.22(B)(1), (E)(2)(d), felonies of the second degree; one count [FN4] of endangering children, a violation of R.C. 2919.22(B)(2), (D)(3), a felony of the second degree; and one count [FN5] of intimidating an attorney, victim, or witness in a criminal case, a violation of R.C. 2921.04(B), a felony of the third degree. Jack pled not guilty to each of the offenses at arraignment.

FN1. These counts were specifically numbered as Counts One, Three, Five, Seven, Nine and Eleven in the indictment.

FN2. These counts were specifically numbered as Counts Two, Four, Six, Eight, Ten, Twelve, and Sixteen in the indictment.

FN3. These counts were specifically numbered as Counts Thirteen and Fifteen in the indictment.

FN4. This count was designated as Count Fourteen.

FN5. This charge was designated as Count Seventeen.

{¶ 3} The charges were based on Jack's alleged abuse of [T.M.], Stephanie Manns' eighteen-month-old toddler. On or about September 22, 2004, Jack moved in with Stephanie, his then girlfriend, and [T.M.].  Between that date and December 5, 2004, Stephanie was employed in Ada, Ohio, and while she was at work, Jack, who was unemployed, was [T.M.'s] primary caregiver. During that time, [T.M.] suffered multiple injuries, including a bump on his head, injuries to his leg, and injuries to his arm. Between December 3, 2004 and December 5, 2004, Stephanie noticed that [T.M.] was favoring his right arm, and that he did not use his arm or want pressure applied to it. [T.M.] also became ill, refusing his favorite foods, vomiting, and refusing to sleep. On December 5, 2004, Stephanie took [T.M.] to St. Rita's Medical Center in Lima, Ohio. After some procedures were conducted at the hospital, [T.M.] was transferred to Children's Hospital in Columbus, Ohio, where he was ultimately found to have suffered a fractured skull, fractured collar bones, a fractured humerus, a fractured shoulder blade, a fractured metatarsal, several fractured ribs, and a lacerated liver. Additionally, [T.M.'s] face, arms, legs, torso, back, and genital area were bruised, and his torso was covered in a rash. Scratches on [T.M.'s] legs were caused by the puppy Jack and Stephanie had, and Stephanie explained that injuries to [T.M.'s] bottom lip resulted from a tumble into the coffee table. However, [T.M.'s] other injuries were unexplained, and the doctors believed them to be the result of child abuse. On December 7, 2004, [T.M.] died in the hospital, apparently from a staph infection.

{¶ 4} After the discovery process was completed, the court bifurcated the indictment for trial. Beginning on April 16, 2007, the court conducted a three-day jury trial on counts one through ten of the indictment. The state presented testimony from eight witnesses, the defense presented testimony from four witnesses, and each party had exhibits admitted into evidence. The parties also

filed stipulations, which were journalized by the court on April 17, 2007. The jury
found Jack guilty on counts one through seven and counts nine and ten; the trial
court having dismissed count eight on Jack's first Crim.R. 29 motion.

(Resp. Exh. 16, ¶¶ 2-4.)

## II.  Procedural History

### A.  Conviction

On September 19, 2005, a Hardin County Grand Jury returned a seventeen count

indictment against Scott, sixteen of which included child endangerment in violation of Ohio Rev.

Code ("O.R.C.") § 2919.22.  Count Seventeen charged him with Intimidation of an Attorney,

Victim, or Witness in a Criminal case, in violation of O.R.C. § 2921.04(B).  (Resp. Exh. 1.)

Scott, through counsel, entered a plea of not guilty on each count.  The trial proceeded on Counts

One through Ten, Counts Eleven through Seventeen having been severed.  (Resp. Exh. 4.)  At

the close of the State's case, the court granted Scott's motion for acquittal on Count Eight.  (Doc.

No. 10, pp. 439-443.)  The jury returned a verdict of guilty on all remaining counts.  Prior to

sentencing, the State's motion for dismissal of Counts Eleven through Seventeen was granted.

(Resp. Exhs. 10, 11.)  On May 3, 2007, Scott was sentenced to serve an aggregate prison term of

twenty-one years, six months.[1]  (Resp. Exh. 12.)

### B.  Direct Appeal

Represented by new counsel, Scott filed a timely Notice of Appeal to the Third District

Court of Appeals, Hardin County, Ohio ("state appellate court"), raising four assignments of

error:

1.  Appellant's conviction for nine (9) counts of Child Endangering was not
    supported by sufficient, credible evidence and the lower court erred in denying
    Appellant's Rule 29 Motion for Acquittal.

2.  Appellant's conviction for nine (9) counts of Child Endangering was against the
    manifest weight of the evidence.

3.  Appellant was denied the right to effective assistance of counsel and a right to a

---

[1]The trial court ruled that Counts One, Three, Five and Nine were allied offenses of
similar import, and, therefore, merged Count One with Count Two, Count Three with Count
Four, Count Five with Count Six, and Count Nine with Count Ten.  (Resp. Exh. 12.)

fair trial.

    4.      The lower court erred in imposing consecutive maximum sentences.

(Resp. Exh. 13.)  On January 14, 2008, the Court of Appeals affirmed the trial court's judgment

of conviction and sentence as to Counts One through Six, but reversed the judgment on Counts

Seven, Nine, and Ten and remanded for further proceedings.[2]  (Resp. Exh. 16.)  On January 24,

2008, Scott, through counsel, filed an application for reconsideration, which was denied on

March 12, 2008.  (Resp. Exhs. 18, 21.)

    On May 6, 2008, Scott, *pro se*, filed a motion for delayed appeal in the Ohio Supreme

Court.[3]  (Resp. Exh. 22.)  On June 18, 2008, the Court denied Scott's motion and dismissed the

case.  (Resp. Exh. 23.)

**C. Remand**

    On April 23, 2008, the trial court vacated the judgments on Counts Seven, Nine and Ten

pursuant to the state appellate court's order.  (Resp. Exh. 24.)  Scott's convictions and sentences

on the other counts remained in full force comprising an aggregate prison term of fifteen years.

*Id.*  He did not file any further appeal.

**D. Federal Habeas Petition**

    Scott's habeas petition raises two grounds for relief:

**Ground One**: Actual Innocence

    **Supporting Facts**: There was not sufficient evidence to support
convictions of child endangering.  In fact, evidence to the contrary supports
Petitioner's claims.

**Ground Two**: Ineffective Counsel

---

    [2]On January 16, 2008, the appellate court filed an erratum to its opinion correcting a
typographical error in paragraph 48 as to which counts were reversed.  (Resp. Exh. 17.)

    [3]The motion for delayed appeal was signed and dated by Scott on April 30, 2008.  The
Ohio Supreme Court Clerk's office file-stamped the motion on May 6, 2008.  Also, according to
the Ohio Supreme Court docket, but not part of the record before this Court, Scott filed a *pro se*
Notice of Appeal that was signed and dated by Scott on April 17, 2008.  Even though it was
dated almost two weeks earlier, it was file-stamped by the clerk's office on the same day as the
motion for delayed appeal – May 6, 2008.

4

       **Supporting Facts**: Appellate Counsel did not file a timely appeal to the Ohio Supreme Court during the pending 26A Application for Reconsideration to Appellate Court.  Petitioner was not informed by counsel of the 45 day period from the last judgment.  On Petitioner's own the last judgment was after Application fro [sic] reconsideration which was on March 12, 2008, 45 days later would be May 26, 2008 which would be timely when Petitioner filed on May 8, 2008.  The Clerk of Court notified the Petitioner that the January 2008 judgment is what was being considered.  Appellate Counsel failed to protect Petitioner's right to pursue his appeal to the higher courts.

(Doc. No. 1.)

### III.  Stay and Abeyance/Motion to Amend Petition

A federal district court has discretion in limited circumstances to stay a habeas action to allow a petitioner to present unexhausted claims to the state courts and then return to federal court on a perfected petition.  *See Rhines v. Weber*, 544 U.S. 269 (2005).  Stay and abeyance is only appropriate when a district court determines that a petitioner has shown good cause for the failure to first exhaust the claims in state courts, a petitioner's unexhausted claims are not plainly meritless, and a petitioner has not engaged in intentionally dilatory litigation tactics.  *Id*. at 277.

Scott filed a motion for stay but did not offer any facts to support his request and did not address the criteria of *Rhines*.  (Doc. No. 13.)  The Court denied the motion without prejudice thereby allowing Scott to refile a motion to stay, along with a motion to amend the petition, addressing the criteria as set forth in *Rhines.*  In the alternative, Scott was invited to inform the Court as to the details of his alleged newly discovered evidence that might impact the grounds for relief in his original Petition.  (Doc. No. 15.)  In response, Scott filed a motion to amend his Petition.  (Doc. No. 16.)  It is difficult to determine whether he is attempting to raise a new ground for relief or advancing additional argument relevant to his sufficiency claim.

In essence, Scott argues that since the state appellate court found insufficient evidence to support his conviction on Count Seven, the trial court committed error when it overruled his motion for acquittal on that same count prior to jury deliberations.  This error was compounded by failing to exclude the testimony of Christopher Glick which Scott claims was applicable to Count Seven, but prejudiced him as to all remaining counts.  Specifically, Scott alleges that "the judge purposely allowed [this witness's] brutal testimony to stay alive in the minds of the jury so they would be influenced by it and convict Scott of all charges."  (Doc. No. 16, p. 2.)

5

The Warden responds that Scott is raising a claim that was not previously raised in state court.  He, therefore, should have requested a stay explaining this new claim and analyzing the *Rhines*' factors.  Even though Scott failed to do this, Respondent, in his opposition brief, analyzes the *Rhines*' factors, arguing that Scott has not demonstrated good cause.  Furthermore, Respondent contends that Scott's new claim lacks merit as it is based on a state evidentiary ruling which is not cognizable in federal habeas.

If the Court treats Scott's motion to amend as raising a new ground for relief, a stay would not be appropriate as the test set forth in *Rhines* has not been satisfied.  The record in this case fails to reflect that Scott can establish good cause for his failure to exhaust state court remedies.  In *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005), the United States Court of Appeals for the Fifth Circuit held that claims are "plainly meritless" for purposes of deciding whether to grant a stay of habeas corpus proceedings when a petitioner is procedurally barred from raising his unexhausted claims in the state courts.  *See also Sieng v. Wolfe,* 2009 WL 1607769, *7, Case No. 2:08-cv-0044 (S.D. Ohio Jun. 9, 2009); *Bailey v. Eberlin,* 2009 WL 1585006, *7, Case No. 2:08-cv-839 (S.D. Ohio Jun. 4, 2009); *Carter v. Friel*, 415 F.Supp.2d 1314, 1321-22 (D.Utah 2006).  The time period for filing a state post-conviction petition and Rule 26(B) application has expired, and Scott would be barred from raising a claim in the state courts absent a showing of "good cause" for his untimely filing.  *See* O.R.C. § 2953.23; Ohio Appellate Rule 26(B)(2)(b).  Nothing in the record indicates that he can meet such a standard.

Addressing Scott's argument that the trial judge allowed irrelevant testimony from a witness under Ohio Evid. R. 401, the state appellate court implicitly concluded that this witness' testimony was relevant when it was used in analyzing the sufficiency of the evidence supporting the convictions under Counts Three and Four.  (Doc. No. 10-2, pp. 199-201, ¶¶ 23-27.)  Moreover, alleged trial errors in the application of evidentiary law, particularly regarding the admissibility of evidence, are typically not cognizable on habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  "[Q]uestions concerning the admission of evidence that may be unfairly prejudicial are committed to the sound discretion of the trial court."  *Oliphant v. Koehler*, 594

6

F.2d 547, 555 (6th Cir. 1979); *see also Johnson v. Karnes*, 198 F.3d 589, 593, fn. 3 (6th Cir. 1999) ("[A]n inquiry as to whether evidence was properly admitted or improperly excluded under state law 'is no part of a federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (citations omitted).  Such claims are only cognizable where the disputed evidence rendered the trial "so fundamentally unfair as to constitute a denial of federal rights." *Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994).  Scott has not demonstrated that his trial was "fundamentally unfair."

Scott also has not presented newly discovered evidence in compliance with *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  The pleadings of *pro se* petitioners are held to less stringent standards than those prepared by attorneys, and are liberally construed when determining whether they fail to state a claim upon which relief can be granted.  *See Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004), *citing Haines v. Kerner*, 404 U.S. 519, 520-21; *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir.1991).  Here, even applying this less stringent standard to Scott's Petition, it is clear that he would have been aware of the trial court's alleged errors and impartiality and could have raised these issues on appeal.

For these reasons, Scott's motion to amend and the arguments raised therein are meritless.  The Court will proceed to address Scott's Petition.

### IV.  Exhaustion and Procedural Default

#### A.  Exhaustion

State prisoners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),(c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot: "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and

prejudice exist to excuse the failure to present the claim in the state courts." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

### B. Procedural Default

A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. *Id.*

Second, a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848-9, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-2 (1991). This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28, 102 S.Ct. 1558. Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id.* In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal. *Id.* Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id.*

The Sixth Circuit uses a four-step analysis to determine whether a claim is procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review,

and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D.Ohio 2002).

A petitioner's procedural default may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *Maupin*, 785 F.2d at 138-39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) *quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986). Ineffective assistance of counsel can be cause for a procedural default. *Murray*, 477 U.S. at 488. However, the exhaustion doctrine "generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id*. at 489. Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id*. However, it is not necessary to resolve the issue of prejudice if a petitioner has not shown cause. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir.1983).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

### C. Application to Scott

#### 1. Ground One

In his first ground for relief Scott claims he is "actually innocent." The Sixth Circuit does not recognize a free-standing actual innocence claim. *D'Ambrosio v. Bagley*, 527 F.3d 489, 498, fn.6 (6th Cir. 2008) (*citing Davis v. Burt*, 100 Fed. Appx. 340, 349-350 (6th Cir. 2004)); *Schlup*, 513 U.S. at 815. However, rather than arguing actual innocence, Scott appears to advance a sufficiency of the evidence claim when he states "[t]here was not sufficient evidence

to support convictions of child endangering."  (Doc. No. 1, p. 5.)

Respondent contends that even if the Court treats ground one as a sufficiency of the evidence claim, the procedural default defense remains applicable.  On direct appeal to the state appellate court, Scott raised a sufficiency of the evidence claim.  However, Scott failed to file a timely appeal with the Ohio Supreme Court and his motion for a delayed appeal was denied.

Pursuant to Ohio Supreme Court Rule II § 2(A)(1), an appellant's failure to perfect his appeal within forty-five (45) days from the entry of the judgment "divest[s] the Supreme Court of jurisdiction to hear the appeal."  However, Ohio Supreme Court Rule II § 2(A)(4) allows an appellant to seek a delayed appeal after expiration of the deadline.  The Ohio Supreme Court, in its discretion, may hear the appeal if it finds adequate reasons for delay.  The Sixth Circuit has recognized that a refusal by the Ohio Supreme Court to hear a delayed appeal amounts to an adequate procedural bar precluding habeas review.  *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (Ohio Supreme Court's denial of Bonilla's motion for leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review of Bonilla's habeas corpus petition), *citing Shabazz v. State of Ohio*, 1998 U.S. App. LEXIS 13444, *3 (6th Cir. June 18, 1998) (unpublished) (The petitioner procedurally defaulted his claims by not filing a timely appeal with the Ohio Supreme Court when that court denied his motion for delayed appeal); *Hall v. Huffman*, 2000 U.S. App. LEXIS 25956 (6th Cir. Oct. 11, 2000) (unpublished); *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).  The *Bonilla* court explained that since a motion for delayed appeal does not contain actual claims and supporting arguments sought to be presented on appeal, the denial of a motion for a delayed appeal is necessarily a procedural ruling rather than a ruling on the merits.  *Bonilla*, 370 F.3d at 497.

Here, the Ohio Supreme Court actually enforced its procedural rule requiring the appeal to be perfected within 45 days by denying Scott's motion to file a delayed appeal.[4]  Further, as

---

[4]The Ohio Supreme Court's denial contained the following language: "Upon consideration of appellant's motion for a delayed appeal, It is ordered by the Court that the motion is denied.  Accordingly, this cause is dismissed."  (Doc. No. 10, Exh. 23.)  If a state court is silent as to its reasons for denying requested relief, a habeas court assumes that the state court

the claims Scott would have raised were never before the Court, its denial of Scott's motion could not have been based, in any respect, on the merits.  The only reasonable interpretation of the Court's denial of Scott's motion for a delayed appeal is that it enforced its procedural sanction finding Scott's stated reasons for the delay were insufficient to excuse his untimeliness. *See Bonilla*, 370 F.3d at 497.

Even though ground one is procedurally defaulted, a federal court may consider it if a petitioner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law.  *Franklin v. Anderson*, 434 F.3d 412, 417 (6ᵗʰ Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Scott does not specifically argue cause and prejudice.  However, he alleges ineffective assistance of appellate counsel in his second ground for relief.  Ineffective assistance of appellate counsel may constitute cause for a procedural default, *Murray*, 477 U.S. at 488, unless that claim is also procedurally defaulted.  *Edwards v. Carpenter*, 429 U.S. 446, 452 (2000).  This issue will be addressed in the analysis of ground two below.

### 2.  Ground Two

In Scott's second ground for relief he alleges he was denied effective assistance of appellate counsel as follows: 1) counsel did not file a timely appeal to the Ohio Supreme Court during the pending motion for reconsideration; 2) counsel did not inform him of the 45-day time frame to file an appeal; 3) counsel failed to inform him that the 45-day time frame to file an appeal is calculated from the date of the original opinion and not from the denial of the motion for reconsideration; and 4) counsel failed to protect Scott's right to pursue an appeal to the higher courts.  Respondent contends that Scott has no right to the assistance of counsel on appeal to the Ohio Supreme Court, and, therefore, he cannot use ground two to justify his procedural default of ground one.

As Scott presented none of these claims to the state court, this ground is procedurally

---

would have enforced any applicable procedural bar.  *See, e.g., Simpson v. Sparkman*, 94 F.3d 199, 203 (6ᵗʰ Cir. 1996).

defaulted.  *See O'Sullivan*, 477 U.S. at 488-489.  Ohio law prohibits him from raising this issue now.  *See Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008) (finding that the petitioner procedurally defaulted his claim because he failed to comply with the timeliness requirements in Ohio App. R. 26(B)).  The Court will next consider whether ground two may be used as cause to excuse the procedural default in ground one.  *See Edwards*, 529 U.S. at 452, 453.

Ordinary attorney error does not constitute cause.  *Murray*, 477 U.S. at  488; *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999);  *see, e.g., Williams v. Hurley*, No. 2:05-cv985, 2006 WL 1804550, at *1-2 (S.D. Ohio June 28, 2006).  Rather, the error must amount to constitutionally ineffective assistance of counsel under the test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).[5]  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Howard*, 405 F.3d at 478; *Manning v. Hoffman*, 269 F.3d 720, 723-24 (6th Cir. 2001) (ineffective assistance of appellate counsel can be cause).

While there is no constitutional right to counsel in a direct appeal to the Ohio Supreme Court, *see Evitts v. Lucey,* 469 U.S. 387, 394 (1985); *Ross v. Moffitt,* 417 U.S. 600, 609-10 (1974), the Sixth Circuit has recognized that an appellate attorney is constitutionally ineffective when that attorney does not notify his client of the results of the appeal of right in a prompt manner so as to permit a timely discretionary appeal to be filed.  *Smith v. State of Ohio Rehab. and Corrections*, 463 F.3d 426,  433 (6th Cir. 2006), *reh'g. and reh'g en banc,* (2007).  Such

---

[5]The two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel.  Thus, Scott must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable.  *Strickland*, 466 U.S. 668, 687 (1984).  An appellant has no constitutional right to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel.  *United States v. Perry*, 908 F.2d 56, 59 (6th Cir.), *cert. denied*, 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990).  "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome."  *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003)(internal quotation marks and citations omitted).

ineffectiveness is cause for a procedural default in not filing a timely appeal with the Ohio Supreme Court. *Id.; see, e.g., Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray*, 477 U.S. at 488-89.

Appellate counsel's duties do not terminate the moment the court of appeals hands down its decision. "Because a defendant is entitled to effective assistance of counsel on direct appeal, such an individual must be accorded effective assistance of counsel throughout *all* phases of that stage of the criminal proceedings." *Smith* at 433. A litigant must have, at a minimum, timely notice that his appeal was decided and that the clock for a discretionary appeal has started running. "Providing that information is the responsibility of the appellate attorney. Anything short of requiring the appellate attorney to discharge his [ ] responsibilities creates a legal 'Bermuda triangle' where even potentially valid claims disappear without ever being heard." *Nix v. Warden, Warren Correctional Institution*, 2007 WL 2326866 (S.D. Ohio 2007) (*citing Foster v. Money*, 2006 WL 3342725, (N.D. Ohio 2007)).

When a petitioner alleges that his counsel's ineffective assistance led "to the forfeiture of a proceeding itself" by denying him the opportunity to appeal, prejudice is presumed. *Roe v. Flores-Ortega*, 528 U.S. 482, 483 (2000) (involved direct appeal to state appellate court). For this presumption to apply, however, petitioner must demonstrate that counsel's deficient performance "actually cause[d] the forfeiture of the [petitioner's] appeal." *Id*. at 484. In *Roe v. Flores-Ortega*, the Supreme Court held that a petitioner claiming that counsel's failure to consult with him regarding filing an appeal was entitled to the presumption of prejudice if he could "demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id*. The Sixth Circuit applied a modified version of this standard in a case in which the petitioner alleged that appellate counsel did not inform him of the decision, or otherwise, he would have timely appealed to the Ohio Supreme Court. *See Smith* at 435. The *Smith* court noted that prejudice will be presumed when counsel is deficient in reporting the results where "'there is a reasonable probability that, but for counsel's deficient failure to' notify [petitioner] of the Ohio Court of Appeals decision, [petitioner] would have 'timely appealed' to the Ohio Supreme Court." *Id*. at 435 (*quoting Roe*

*v. Flores-Ortega* at 485.)  The *Smith* court, however, went on to determine that counsel's deficient performance did not prejudice the petitioner since he made no attempt to appeal for approximately five months after he received the notification of the results of his appeal as of right.  *Id.* at 436.

Scott does not indicate the date on which he received the appellate court decision.  He stated in his motion for delayed appeal and affidavit of facts filed with the Ohio Supreme Court that he first discovered, upon receiving notice from the court, that January 14, 2008, was the date on which the clock would begin to run to file a discretionary appeal.  (Doc. No. 10-3, p. 43.)  Scott fails to indicate the date he received such notice from the court.  He also fails to mention the date his attorney communicated the result to him.

Initially, Scott's *pro se* status in pursuing an appeal to the Supreme Court of Ohio is insufficient to establish cause to excuse his procedural default.  *See Bonilla*, 370 F.3d at 498 (*citing Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995).  Additionally, to the extent Scott contends that appellate counsel failed to protect his right to pursue a discretionary appeal, his argument is unavailing.  As Scott's counsel filed a motion for reconsideration on January 24, 2008, the Court can presume that Scott had knowledge of the appellate court's decision by that date, if not before.  Scott does not allege he was without prompt notice of the appellate court's decision, nor does he allege that he communicated to counsel his desire to file an appeal.

In assessing whether a defendant such as Scott "would have timely appealed," the *Smith* court applied a presumption that if the period of time between when the defendant learned of the decision and when he attempted to appeal the decision is greater than the period allotted by state law for the timely filing of an appeal, the defendant failed to demonstrate that he "would have timely appealed" the decision but for the counsel's deficient failure to notify the defendant of the decision.  *See Smith* at 435.  "[A]llowing a greater amount of time would generally bestow a windfall upon the defendant whose counsel promptly failed to notify the defendant of a decision."  *Id*.

Although the record is less than clear, it appears that Scott first attempted to file a Notice of Appeal on April 17, 2008, within 45-days of March 12, 2008, the date his motion to

14

reconsider was denied by the state appellate court.  This would tend to establish under the *Smith* standard that Scott did intend to appeal but was not informed as to the appropriate deadlines.  Therefore, rather than further analyzing whether Scott's appellate counsel's conduct would excuse the procedural default, this Court will proceed to address the merits of Scott's sufficiency claim.  The United States Supreme Court has observed that federal courts are not required to address a procedural default issue before deciding against a petitioner on the merits.  *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).  The Sixth Circuit has also approved this rule where the procedural default question is complicated and unnecessary to the court's determination of the case.  *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Jackson v. Anderson*, 141 F.Supp.2d 811, 826-27 (N.D. Ohio 2001).

## V.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law."  *Ruimveld*, 404 F.3d at 1010, *quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002).

A state court's decision is contrary to clearly established federal law "if the state court

15

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006), *citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998).

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged.  *In re Winship*, 397 U.S. 358, 363-64 (1970).  The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses.  *See id.*; *Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record . . . should be resolved in favor of the prosecution." *Heinish v. Tate*, 9 F.3d 1548, 1993 WL 460782 (6th Cir. 1993) (unpublished opinion), *citing Walker*, 703 F.3d at 969-70; *Wright v. West*, 505 U.S. 277, 296 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)

The state appellate court applied the proper standard when analyzing the sufficiency of

the evidence claim:

> {¶ 8} * * *  Sufficiency of the evidence is a test of adequacy, used to " 'determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' " *Thompkins,* at 386, *quoting* Black's Law Dictionary (6 Ed.1990) 1433; *citing* Crim.R. 29(A); *State v. Robinson* (1955), 162 Ohio St. 486, 124 N.E.2d 148. A conviction based on insufficient evidence constitutes a denial of due process, and the defendant may not be recharged for the offense. Id. at 386-387, *citing Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652, *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed .2d 560. In reviewing a claim under the sufficiency of the evidence standard, an appellate court must determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Bridge,* 3d Dist. No. 1-06-30, 2007-Ohio-1764, *quoting State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668.

(Exhibit 16, ¶ 8).

In Counts One through Six, the convictions that the state appellate court upheld, Scott was charged with child endangering under O.R.C. § 2919.22(A) and (E).  O.R.C. § 2919.22(A) states, in pertinent part: "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person *in loco parentis* of a child under eighteen years of age…shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."  O.R.C. § 2919.22(E) provides for an enhanced penalty where the conduct results in serious physical harm to the child involved or when the offender had previously been convicted of an offense involving neglect or physical abuse of a child.

The state appellate court first analyzed Counts Two, Four, and Six to determine whether there was sufficient evidence to prove the enhancement under O.R.C. § 2919.22(E)(2)(c) as to a finding of serious physical harm.  Regarding Count Two, the state appellate court held the following:

> {10} ***  In count two, Jack was charged for the incident where he swung [T.M.] by his arms approximately two feet off of the ground, which resulted in the injuries to [T.M.]'s right collar bone, right humerus, and right shoulder. Stephanie testified that [T.M.] "favored" his right arm beginning on Friday, December 3, 2004, and by the next day, his arm looked bruised and his collar bone was getting red. (Trial Tr., Aug. 20, 2007, at 167-171; 207). Millie Brown, Stephanie's cousin and neighbor, indicated that she saw [T.M.] on Saturday, December 4, 2004, and at that time, [T.M.] was "favoring" his arm. (*Id*. at 328). Millie testified that [T.M.] kept his arm close to his body and did not want people to touch it. (*Id*. at

17

328-329). On this record, there was sufficient evidence to prove that [T.M.] had suffered serious physical harm to his collar bone, shoulder, and arm because his injuries certainly caused some substantial, temporary incapacity (assuming the bones would have been set and healed had he been treated earlier) and because the injuries resulted in substantial suffering or prolonged, intractable pain since he suffered from the pain for more than two days before seeing a physician.

(Exhibit 16, ¶ 10).

Regarding Count Four, the state appellate court held the following:

{¶ 11} Count four was based on the injuries [T.M.] suffered from the "porch incident" which occurred on or about November 25, 2004. Stephanie testified that on or about that date, she observed [T.M.] limping, and Jack told her [T.M.] had fallen off of the 13-inch high porch because the railing was loose. (*Id*. at 198). Stephanie indicated that [T.M.] continued to limp on the leg and did not want to put pressure on it. (*Id*. at 200). As a result of the leg injury, Jack scheduled an appointment with [T.M.]'s pediatrician for Thursday, December 2, 2004; however, he missed the appointment after he allegedly "overslept." (*Id*. at 201-202).

{¶ 12} Tracy Snyder, the pediatrian's [sic] medical receptionist, testified that a male had called the office and scheduled an appointment for November 29, 2004 because [T.M.] had a hangnail on his toe. (*Id*. at 275-276).  However, prior to that date, a male called the office, indicated that the hangnail was better, and rescheduled the appointment for December 2, 2004 because [T.M.] had leg pain. (*Id*. at 276). Snyder told the jury that [T.M.] did not "show up" for the December 2 appointment. (*Id*.). Detective Robert Wagner testified that Jack voluntarily met with him to discuss [T.M.]'s injuries; that Jack waived his Miranda rights prior to the interview; and that the interview was recorded. (*Id*. at 291). During the interview, Jack told Wagner that following his fall from the porch, [T.M.] had been limping for a few weeks. (*Id*. at 303). Jack also told Wagner that he had overslept and missed [T.M.]'s doctor appointment. (*Id*. at 303).

{¶ 13} Pauline Seitz, Millie Brown's mother, testified that she saw [T.M.] on Thanksgiving Day 2004 and that he was dragging his foot "a little." (*Id*. at 365). Chris Glick, a neighbor and acquaintance of Jack's and Stephanie's stated that he did some painting with Jack on December 1, 2004, and on that day, he observed [T.M.] dragging his leg. (*Id*. at 353). John Manns, Stephanie's brother, testified that he observed [T.M.] limping, and Jack told him [T.M.] had fallen off the porch because of a loose railing. (*Id*. at 371).  Dr. Phillip V. Scribano, from Children's Hospital, testified that [T.M.]'s left metatarsal was broken, and that he had another injury closer to his ankle. (*Id*. at 406). Based on this testimony, there was sufficient evidence for the jury to find that [T.M.] had suffered serious physical harm because he had suffered some temporary, substantial incapacity (again, provided that the injuries would have healed with proper medical treatment) and because [T.M.]'s injury resulted in substantial suffering.

(Exhibit 16, ¶¶ 12-13).

Regarding Count Six, the state appellate court held the following:

{¶ 14} Count six was based on [T.M.]'s other "unexplained" injuries, such as the broken ribs and liver laceration. Scribano, the director of an organization servicing child abuse victims at Children's Hospital, testified that [T.M.]'s belly

18

was "impressive" because it was distended and very tender. (*Id*. at 391). Scribano stated that upon making these observations, he knew there was significant trauma to [T.M.]'s liver. (*Id*.). Scribano stated that CAT scans taken at St. Rita's showed a laceration, or cut, to [T.M.]'s liver, which he graded as a three out of four, with a four being the most severe injury. (*Id*. at 396). Scribano testified that an injury of that type and severity is usually found only in victims of car crashes and victims of abuse due to severe pressure to the abdomen, which forces the liver to compress against the spine. (*Id*. at 397-398). Scribano indicated that [T.M.]'s medical history did not show any evidence of an automobile accident, and he testified that chemical testing showed abnormal results, indicating injury to the liver. (*Id*. at 399; 400-402). The injury to the liver resulted in internal bleeding, which required [T.M.] to have a blood transfusion at Children's Hospital. (*Id*. at 402). Scribano opined based on a reasonable degree of medical certainty that the injury to [T.M.]'s liver was approximately one to two days old when [T.M.] was admitted to St. Rita's on December 5, 2004, and that [T.M.]'s injuries were not accidental, though he could not state exactly how the injuries were sustained. (*Id*. at 433; 437). On this record, there was sufficient evidence for a jury to find that [T.M.] suffered severe physical harm based on the injuries in count six, as at least the liver laceration required hospitalization.

(Exhibit 16, pp. 12-13).

The state appellate court then examined whether recklessness was demonstrated in Counts One through Six.  As to Counts One and Two, the state appellate court held that there was sufficient evidence:

{¶ 20} Counts one and two both resulted from the injuries [T.M.] sustained while Jack allegedly swung him in circles. The record reveals that Jack would hold [T.M.] by the hands and wrists, and spin himself in circles, thereby causing [T.M.] to be lifted off the ground, to a height of approximately two feet, and rotated in circles around Jack. Stephanie testified that [T.M.] began to favor his arm on December 3, 2004. (*Id*. at 167-168). Jack explained to Stephanie that he had been swinging [T.M.] as described above. Jack told Stephanie he swung [T.M.] a total of three times, and that he quit when [T.M.] "whimpered." (*Id*.). On cross-examination, Stephanie testified that Jack was swinging [T.M.] because [T.M.] thought the activity was fun, and that Jack had no intention of injuring the child. Jack relayed a similar story to Detective Wagner. Jack told the detective that he would swing [T.M.] around five or six times and then put him down. (*Id*. at 295). Jack completed two rounds of five or six circles, but on the third set, [T.M.] "whimpered" so he quit. (*Id*.).

{¶ 21} The state's expert witness, Scribano, offered a different theory on Jack's swinging of [T.M.]. Scribano testified that he had seen or heard of adults swinging a child in a manner similar to that which Jack described. However, he stated that merely swinging the child in such a way was not consistent with the injury to [T.M.]'s right collar bone. (*Id*. at 412). Instead, the doctor opined that the injuries [T.M.] sustained were caused by a very forceful jerk or swinging. (*Id*. at 413). Pressed further, Scribano stated that such injuries could have resulted from swinging the child, but that the swinging had to have been very forceful. (*Id*. at 414). Scribano's ultimate conclusion was that [T.M.]'s injuries resulted from abuse. (*Id*. at 415).

{¶ 22} The facts as to counts one and two were clear. [T.M.] sustained fractures

19

to his collar bone, humerus, and shoulder blade. The injury occurred during a time when only Jack had access to the child. Although Jack had an explanation, which appears to be plausible, for why [T.M.] had been favoring his right arm, the jury could have easily disbelieved such theory after hearing Scribano's expert testimony and viewing the physical evidence showing [T.M.]'s injuries. If the jury believed Scribano, which it apparently did, it could have easily found that Jack had recklessly created a substantial risk of harm to [T.M.]'s health or safety by swinging him in such a forceful manner. On these facts, there was sufficient evidence in the record to support the convictions on counts one and two. *See generally State v. Flory*, 3d Dist. No. 15-04-18, 2005-Ohio-2251, at ¶ 7 ("The State also presented evidence that Flory's explanations of the accidents did not explain the extent of the injuries suffered by Kaleb during his short life and that the injuries were consistent with abuse. * * * Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that *Flory* recklessly had created a substantial risk to the health and safety of Kaleb by violating his duty of care to the child.").

(Exhibit 16, ¶¶ 20-22.).

Regarding Counts Three and Four, the state appellate court held the following:

{¶ 23} The third and fourth counts were based on the leg injuries [T.M.] suffered during the "porch incident." Stephanie testified that on or about November 25, 2004, she noticed [T.M.] limping. (Trial Tr., at 198). When she inquired, Jack told her [T.M.] had been playing on the porch railing, which came loose and caused him to fall. (*Id*. at 198-199). Stephanie testified that Jack cancelled [T.M.]'s doctor's appointment, which had been scheduled for the end of November; that he scheduled an appointment for December 2, 2004; and that he missed the December 2 appointment, claiming that he had overslept. (*Id*. at 201-202).

{¶ 24} Tracy Snyder testified that a male caller scheduled an appointment for [T.M.] for November 29, 2004. (*Id*. at 275). However, the appointment was rescheduled by a male caller for December 2, 2004. (*Id*. at 276). Snyder testified that [T.M.] missed his appointment on December 2. Detective Wagner testified that Jack told him about the injury to [T.M.]'s leg. Wagner stated:

> He told me there was one incident that happened, he said it was about two, two and [a] half weeks prior to the interview. He uh told me that he was walking up to the uh porch, he put [T.M.] on the top step, and at which time he let go of [T.M.], he had some packages and he was getting his keys and went inside the house. When he put the stuff down inside the house he heard [T.M.] cry, came outside, and found [T.M.] on the sidewalk face down.
>
> (*Id*. at 299). Wagner investigated at Stephanie's home, noticed a loose railing, and measured the distance from the top of the porch to the sidewalk; a total of 13 inches. (*Id*. at 301-303). Jack told Wagner that he was supposed to take [T.M.] to the doctor on December 2 because of the injury to [T.M.]'s leg, but he overslept and missed the appointment. (*Id*. at 303).

{¶ 25} Chris Glick testified that he observed [T.M.] dragging his leg when he helped Jack paint cabinets on December 1, 2004. (*Id*. at 353). Glick also testified that he lived near Stephanie's home, and on the morning of December 2, 2004, at sometime between the hours of 8:00 a.m. and 9:00 a.m., he observed Jack's

brother's truck at Stephanie's home. (*Id*. at 348). Glick stated that he noticed the front door was open. (*Id*.). Glick testified that he knew [T.M.] had a doctor's appointment that morning, so he asked Jack why he did not go to the doctor. Jack told Glick that his brother had stopped by to pick up the vacuum cleaner and that he had overslept and missed [T.M.]'s appointment because Stephanie had forgotten to set the alarm. (*Id*. at 349). Jack apparently told Glick, "he would blame it on Stephanie that she didn't set the alarm for him to get up in time," and Glick found that statement to be unusual. (*Id*. at 350).

{¶ 26} John Manns testified that he observed [T.M.] limping at one point. (*Id*. at 371). Jack told John that [T.M.] had fallen off of the porch because of the loose railing. (*Id*.). Finally, Scribano testified that the fractures on [T.M.]'s leg were subacute, meaning they had occurred between seven and 21 days prior to his exam. (*Id*. at 411). Again, Scribano testified that [T.M.] was the victim of abuse and although he could not state how the injuries occurred, he was certain they were not accidental. (*Id*. at 415; 437).

{¶ 27} The facts as to counts three and four were clear. [T.M.] sustained fractures and injuries to his left foot, which caused him to limp for at least a week before he was taken to the hospital. The injury occurred during a time when only Jack had access to the child. Again, Jack's explanation of the injury seems plausible; however, the jury could have easily disbelieved him in light of Scribano's testimony and after viewing the physical evidence depicting [T.M.]'s injuries and Stephanie's porch. If the jury disbelieved Jack's explanation, which it apparently did, it could have easily found that Jack recklessly created a substantial risk of harm to [T.M.]'s health or safety. This is true particularly in light of the evidence that Jack failed to take [T.M.] to the hospital or to any doctor between the time he first began to limp, on or about November 25, 2004, and the time Stephanie took him to St. Rita's Medical Center on December 5, 2004. On these facts, there was sufficient evidence to support the convictions for counts three and four. *See Flory*, at ¶ 7; *State v. Evans* (1994), 93 Ohio App.3d 121, 637 N.E.2d 969, *citing State v. Legg* (1993), 89 Ohio App.3d 184, 623 N.E.2d 1263; *State v. Sandefur* (Aug. 11, 1993), 9th Dist. No. 15787 (convictions for child endangering may be upheld where the people named in R.C. 2919.22(A) did not seek medical attention for the child).

(Exhibit 16, ¶¶ 23-27).

Regarding Counts Five and Six, the state appellate court held the following:

{¶ 28} The fifth and sixth counts were the result of [T.M.]'s other unexplained injuries, notably the broken ribs, lacerated liver, and numerous other bruises. Again, Stephanie testified that Jack was [T.M.]'s sole caretaker when she was at work. Stephanie testified that on December 4, she intended to, but did not, take [T.M.] to the hospital because Jack told her that "they" would take [T.M.] away from her. (Trial Tr., at 179). Stephanie stated that she took [T.M.] to the hospital on December 5 because he had not slept, would not eat, and was vomiting. (*Id*. at 181). At St. Rita's, Stephanie discovered the extent of [T.M.]'s injuries. (*Id*. at 208).

{¶ 29} As mentioned above, Jack told Detective Wagner he did not believe Stephanie would have injured [T.M.]. (*Id*. at 293). The medical testimony offered by Scribano has been set forth above in the discussion of whether [T.M.] suffered serious physical harm. On this record, there was sufficient evidence to support convictions on counts five and six. Although there was no evidence explaining

21

exactly how [T.M.] came to have the broken ribs or the lacerated liver, Scribano's testimony was clear that [T.M.]'s injuries, particularly the lacerated liver, were caused by abuse. Jack admitted to Wagner that none of the people he and [T.M.] visited could have injured [T.M.] because he was always present. (*Id.* at 293-294). The only evidence in the record is that [T.M.] suffered various inflictions between the times Stephanie saw him before work and the times she arrived home from work.

{¶ 30} We note that in *State v. Miley* (1996), 114 Ohio App.3d 738, 684 N.E.2d 102, the Fourth Appellate District refused to uphold a conviction for child endangering where the state produced circumstantial evidence establishing that the child had been abused, and that the defendant was one of only two people who had access to the child. However, one of the key factors in that case was the fact that none of the child's injuries were external, which would have alerted the defendant to the fact that the child had been abused. In this case, we have a different scenario. Perhaps the broken ribs could not have been realized, but by the time [T.M.] became seriously ill on Friday, December 3, 2004, his condition was noticeable and apparently worsened until he was taken to the hospital on Sunday, December 5, 2004. Also unlike *Miley*, we have admissions from the defendant that none of his friends caused injury to [T.M.] and that Stephanie did not cause injury to [T.M.], but he could not explain how [T.M.] was injured and simply denied any involvement. The evidence shows that [T.M.] was relatively healthy when Stephanie went to work, but was injured when she returned. There is also evidence that Jack attempted to dissuade Stephanie from taking [T.M.] to the hospital on December 5 by telling her that "they" (apparently meaning Children's Services) would take her child away from her. On this record, there was sufficient evidence for a jury to find beyond a reasonable doubt that Jack recklessly created a substantial risk of harm to [T.M.]'s health or safety.

(Exhibit 16, ¶¶ 28-30.)

In each of the first six counts, the appellate court extensively reviewed the trial testimony and concluded that a reasonable jury could find that Scott had recklessly created a substantial risk of serious physical harm to the child. The state appellate court also addressed whether the victim was under Scott's control and concluded that there was sufficient evidence for a jury to find that Scott was a person with control over the victim. (Exh. 16 ¶ 19.) Additionally, the appellate court held that Scott had stipulated to his prior convictions under O.R.C. § 2929.12(E)(2)(b). (Exh. 16, ¶ 9.)

The reasonableness of the appellate court's opinion is evident in its citations to the trial transcript which verifies its findings, as well as its consideration and dismissal of Counts Seven through Ten, where it concluded that sufficient evidence to convict was lacking. Scott raises no specific arguments to dispute the finding of sufficient evidence. Ground one is without merit.

22

## VI.  Conclusion

For the foregoing reasons, it is recommended that Scott's motion to amend his Petition and his original Petition be denied.  (Doc. Nos. 1, 16.)

 s/ Greg White
United States Magistrate Judge

Dated:   August 19, 2009

## OBJECTIONS

**Any objection to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**